MARTIN LECHNER, a Minor, by ESTELLE LECHNER, His Next Friend, Appellant, v. FRED C. PETERS.—46 S. W. (2d) 527.

Division Two, February 17, 1932.

*Foristel, Mudd, Blair & Habenicht* for appellant.

892

*Lewis & Rice* and *Jones, Hocker, Sullivan & Angert* for respondent.

COOLEY, C.—Appeal by plaintiff from an order of the Circuit Court of the City of St. Louis sustaining defendant's motion for new trial. Plaintiff, then a boy about eight years of age, was struck and seriously injured by a truck at a street intersection in St. Louis. His suit was brought originally against the Busy Bee Motor Car Company, a corporation, the Schacht Company, a corporation, Fred C. Peters, individually, and Fred C. Peters, Fred W. Peters and A. B. Horton as partners. During the trial and before submission of the case to the jury plaintiff dismissed as to all defendants except Fred C. Peters and the case was submitted with him as the sole defendant.

The petition charged that the defendants collectively were engaged in the automobile repair business; that plaintiff was riding a bicycle southwardly in 39th Street at or near its intersection with Botanical Avenue, when he was struck and injured by an automobile truck owned by the defendants and being driven on their behalf westwardly in Botanical Avenue, his injuries being the result of the negligence of defendant's servant, the driver of the truck. There are ten specifications of alleged negligence on the part of the truck driver, but only two were submitted, viz., failure of the driver to keep his truck as close as practicable to the right side of the highway and negligence under the humanitarian rule. The answer of defendant Peters was a general denial.

The court refused defendant Peters' request for a peremptory instruction directing a verdict for him at the close of plaintiff's evidence and again at the close of all the evidence. Plaintiff recovered a verdict for $35,000. The court sustained Peters' motion for a new trial on the ground, specified of record, that the court had erred in refusing his requested instruction directing a verdict for him at the close of the evidence. From that order plaintiff appealed. Further facts will be given in connection with the discussion of issues upon which they bear.

The negligence charged is that of the driver of the truck. Defendant is sought to be held liable upon the theory that the driver was his servant or agent. The question for determination is, therefore, was there the relation of master and servant between Peters and said driver?

Plaintiff was injured on December 27, 1925. The driver of the truck which injured him was one Athey. On and prior to December 2 Athey was admittedly an employee of the defendant Busy Bee Motor Car Company, which then owned and operated the automobile repair and service business involved. One Elsie Schacht, widow of Arthur Schacht, owned or controlled the majority of the corporation stock and managed and controlled the business. On December 2, 1925, she made a contract with defendant Peters by which she agreed to sell and transfer to him, with other property, the above mentioned property, business and good will of said corporation which for brevity we will call the Busy Bee Company. The contract provides:

"This agreement, made and entered into in duplicate this 2nd day of December, 1925, by and between Elsie Schacht of the City of St. Louis, State of Missouri, hereinafter for convenience called 'Owner,' and Fred C. Peters of the City of St. Louis, State of Missouri, hereinafter for convenience called 'Purchaser,' witnesseth:"

Then followed provisions that the owner represents and agrees that she is administratrix of the estate of her deceased husband who owned certain described real estate and 30 shares of the total 90 shares of the Busy Bee Company; that certain portions of that and other real estate mentioned in the contract were leased for ten years to one Kempf at a named rental; that she and her husband owned by the entirety at his death certain other described realty which was rented to various tenants named, stating the amounts payable as rents; that she owns or controls 60 shares of the stock of the Busy Bee Company, is secretary and director and "that she absolutely controls the affairs of said corporation through her stock ownership and as an officer and director;" that all of the properties described are free of liens and encumbrances and that the property described in List A attached, which was to be conveyed to Peters, belonged to the Busy Bee Company or to her. (List A included the truck which struck plaintiff.) The contract then proceeds:

"Owner hereby agrees to sell, transfer and deliver or cause to be sold, transferred and delivered to said purchaser all of the land hereinabove described, together with all improvements, fixtures and eqipment located upon said land (except the fixtures and equipment belonging to tenants hereinabove described, which fixtures and equipment are more particularly described in 'List B' hereto attached and made a part hereof) by warranty deed, and all of the personal property described in 'List A' by bill of sale, and to carry out the other obligations herein assumed by her, all for the consideration of $113,075, which amount said purchaser hereby agrees to pay as follows:

"(a)  $5,000 cash as earnest money and part purchase price this day paid by purchaser to owner, the receipt of which is hereby acknowledged;

"(b) Balance of purchase price, to-wit, $108,075, in cash upon acceptance by purchaser from owner of warranty deeds and bills of sale evidencing the transfer of the real estate and personal property hereinabove described.

"Owner hereby further agrees to sell and deliver to said purchaser the good will of the Busy Bee Motor Car Company, together with the exclusive right to the use of the name 'Busy Bee Motor Car Company' and to change the name of that company if and when requested by purchaser so to do, so as to make it possible for said purchaser to organize a new company under said name. . . .

"Owner further agrees to comply with the Bulk Sales Law in transferring the property of the Busy Bee Motor Car Company, and to take such other action as may be required from time to time by the attorney for the purchaser in order to completely vest in the purchaser title to all of the property hereinabove described.

"Owner further agrees to transfer to said purchaser her interest, if any, in the alleys adjoining the property hereinabove described.

"Rents, interest, water license, taxes and insurance to be adjusted as of date of transfer of the property.

"The sale under this contract is to be closed on or before January 2, 1926, at the office of Wagner-Grant-Bell Realty Company, and upon closing of said sale, owner hereby agrees to pay to said realty company the sum of $5,875 as commission. If sale is not closed at that time owing to failure or neglect of the purchaser to comply with the terms hereof, the above mentioned earnest money is to be forfeited to the owner, but such forfeiture shall not release said purchaser from any liability for the fulfillment of this contract of sale or the payments of money herein mentioned, if said owner shall elect to enforce the fulfillment of the same.

"If upon examination, the title be found imperfect and cannot be perfected within a reasonable time, or if for any reason good title cannot be transferred by owner to purchaser in and to all of the property hereinabove described at the date of closing or within a reasonable time thereafter, then purchaser is to be paid a reasonable cost of examination of title, the earnest money is to be refunded and purchaser is to be released from any further obligation hereunder.

"Parties hereto agree that in the event this contract is finally consummated, purchaser shall pay to said owner in addition to the purchase price hereinabove set out, interest at the rate of six per cent per annum upon the sum of $108,075 from the date hereof to the date of the transfer of deeds, as herein provided for, and in consideration of said payment of interest, owner shall account to purchaser for all profits made by said owner from date hereof to date of transfer of deeds out of the operation of any of the premises hereinabove described or sale of any of the personal property hereinabove de-

scribed or rents upon property hereinabove described, and owner hereby agrees to immediately install a set of books as directed by purchaser for the purpose of ascertaining said profit.

"Owner agrees to immediately submit to the examination by the purchaser of contracts for the purchase of gasoline or other supplies and all other contracts which may remain in effect after the sale herein provided for has been consummated and assist said purchaser in securing the assignment to purchaser of any of such contracts which the purchaser may desire. . . .

"Owner hereby agrees to render during 1926 to purchaser reasonable assistance in the conduct of the business from time to time as requested by purchaser without compensation.

"It is understood and agreed by the parties hereto that any cash on hand or bills receivable held by the Busy Bee Motor Car Company at the time this transaction is consummated by passing of deeds and bill of sale shall remain the property of the Busy Bee Motor Car Company, excepting that so much of said cash or accounts receivable as represent profits made from December 2, 1925, to January 2, 1926, shall be paid to the purchaser.

"It is understood and agreed by the parties hereto that said parties, their heirs, administrators and successors and assigns are all bound by this contract.

"It is understood and agreed by the parties hereto that all warranty deeds, bills of sale, also resolutions and minutes of the Busy Bee Motor Car Company and orders of the probate court shall be passed on and approved by counsel for both parties.

"In witness whereof, owner has executed this agreement in her individual capacity, in her capacity as administratrix of her husband's estate, and the Busy Bee Motor Car Company, and has caused to be signed by the president and attested by the secretary of said Motor Car Company in accordance with the resolution of its board of directors, and purchaser has executed same in his individual capacity."

It will be necessary to set out rather fully the evidence relied upon by plaintiff in support of his contention that Peters, immediately after the contract was made, assumed control and management of the business and at the time of the accident stood in the relation of master to the truck driver, for upon the existence of that relationship between Peters and the truck driver depends Peters' liability, if the driver's negligence caused the plaintiff's injuries. And since plaintiff claims that portions of Peters' testimony aids his case it will be necessary to include in our statement a summary of Peters' testimony bearing on the question of said relationship.

The plaintiff called as his witness Elsie Schacht, then still in the case as a co-defendant of Peters. She testified:

"Q. I will ask you, Mrs. Schacht, if you were interested in the Busy Bee Motor Car Company back in December, 1925? A. Only as an employee after the 2nd of December."

Objection was then made that that answer was a conclusion, which objection was sustained, but there was no motion to strike the answer.

The witness then stated that her husband and other stockholders "were operating an automobile business out here at Manchester and Taylor prior to his death," and that she as administratrix came into possession and control of the controlling interest in the company. She identified the contract with Peters which plaintiff later introduced in evidence.

"Q. Now, beginning on the 2nd day of December, 1925, I will ask you to state whether or not you continued the operation of the business, or whether somebody else did? A. I did not.

"By MR. HOCKER (for defendant Peters): I object to that as a conclusion.

"THE COURT: The objection is sustained.

"Q. Beginning on the 2nd day of December, 1925, what, if any, change that you know of was there in the management of the business?" Defendant Peters objected to the question as calling for a conclusion, which objection, after some argument by counsel, was by the court sustained, but the court said: "I will permit you to show what the parties did out there."

"Q. What was done out there after the 2nd day of December with reference to the work and giving orders and the execution of orders—

"MR. HOCKER (interrupting): Same objection as heretofore.

"THE COURT: Your objection may run through all this line of testimony and the ruling will be the same.

"Q. (Continuing):—with reference to the conduct and carrying on of the business? A. There was a foreman and different men in the shop, and Mr. Horton—

"Q. (Interrupting): Who gave you the orders as to the management and conduct of the business? (Objected to as calling for a conclusion).

"THE COURT: Show what orders were given and who gave them.

"MR. COX (for plaintiff): I just want to show who gave the orders. A. They weren't always given by the same party. We didn't decide who was going to be foreman, although most of the orders were given by Mr. Peters until Mr. Horton came in and it seems as though it was understood that he was to be his partner—

"MR. HOCKER (interrupting): I ask that that be stricken out.

"THE COURT: That will be stricken out as a conclusion."

The witness then testified that Peters was there every day; that he had certain carpenter work done, remodeling the inside of the building by taking out some partitions and putting up some new walls (throwing two or three small rooms together as shown by the cross-

examination); that she had nothing to do with that, Peters hiring and paying his own men for that work, and she did not know "what his ideas were in changing;" that Peters started that work shortly after December 2.

With reference to the money "taken in from the business" during December, witness said it was placed in the Southwest Bank, in which neither she nor Peters had previously carried their accounts; that by agreement between them it was deposited in the name of John Smith. Her testimony shows that she made the deposits and was the only person authorized to check on the account. She testified that "for the week of the happening of this accident Mr. Peters paid all the men with his own personal check, for the salaries of all the men for the entire week." Though out of its chronological order it may be here stated that from the cross-examination of witness it appeared that the contract was consummated on December 31 by delivery of deeds and bill of sale transferring the properties to Peters as per the contract and payment by him of the purchase money, and that they settled "in accordance with the terms and stipulations of the contract itself." Witness said the amount turned over to Peters as receipts of the business for December was "net receipts."

"Q. Did he give you any orders during that time with reference to the running of the business? A. Yes, sir."

Objection and motion to strike out the answer on the ground that it was a conclusion was made and sustained.

"Q. State what was said. What were some of the orders? A. He told me how to keep the records and he instructed me to start this account and told me to send men out on trips when calls came in. That is about as much as I did, I guess."

She testified that before the accident Athey went in the truck to start a car. "We had recieved a call to start some fellow's car . . . and that was where he had been and he was on his way back when the accident occurred." She did not say who directed Athey to go on that errand nor was there any evidence showing that fact. On cross-examination by Mr. Hocker the witness testified that from December 2 to December 31 when the contract was consummated, "I acted under this contract;" that no money was drawn out of the John Smith account "until the end," when she herself drew it out; that in the latter part of December she had the name of the Busy Bee Company changed to the Schacht Company (one of the original defendants) so that Peters could organize a new corporation under the old name of Busy Bee Motor Car Company, and thus retain the good will; that this was done by Peters about December 30 or 31. On December 31 the old Busy Bee Company, under its new name of the Schacht Company, executed and delivered to Peters a bill of sale conveying all the assets of that company described in the contract and deeds were made and delivered to him conveying the real

estate and Peters paid the purchase money, all as provided by the contract.

On cross-examination by Mr. Miller (for corporation defendants) witness testified: New people not hired by witness or by the Busy Bee Company came in there to work after December 2nd and before the accident. Mr. Horton, who witness understood was to go into business with Peters, came and brought with him three or four men who had been working for him in the hauling business. (It was not shown that those men did any work after coming there other than for Horton in his own paper hauling business which he seems to have continued during December.) Peters ordered all the stock brought into the stock room and put a man in charge of it. Those were "all the new men that there were." Peters employed a Miss Hennsler, who was suggested by witness, to keep the books. Mr. Peters asked her to clean out witness's desk, which she did. On December 2 there was on hand a stock of tires, gasoline, etc., and money derived from sales of such stock after December 2 was turned over to Peters "when the deal was closed," December 31. (An inventory of the stock had been made by Peters when the contract was signed.) Peters had access to the cash register and he took money out of it every day for his own use. Witness was shown a card which she said "is a job card that we made out when a job comes in and it is marked that it came in on the 16th of December and part of it was made out by me and part of it by the girl and it is marked 'paid' by the girl." From the time of her employment Miss Hennsler accepted payment on bills but she did not do all of the office work. (Witness did not say who did the balance of it. We gather from her whole testimony that she herself did it.) After Horton came he and Peters conferred from time to time about the business. Witness was not out in the shop and did not know whether or not Peters gave orders to the men there. "All I know is when calls came or orders. When calls came in on the telephone I would write them down and then holler out to send in a man to take the call and make the trip, but if Mr. Peters was there he did it. I was at times out there in the shop, but I didn't make it my business to be out there. I had to go through the shop sometimes to talk to the men." Peters was not a mechanic and could not tell the men what to do on repair jobs and such things in the mechanical features of the business, so one of the men in the shop had to do it. Horton was a mechanic and gave the mechanics orders after he came,—witness had heard him talk to the men—would not say he gave them all the orders. An employee named Stanton who "was on the payroll" (evidently before December 2) was considered foreman until a certain sign was put up, after which time orders were taken from Horton, and Stanton did not give any orders. Mrs. Schacht said that nobody could get along with Stanton "so they put up this sign. Then they did call on Mr. Horton." (This sign referred

to was over Peters' signature, according to Mrs. Schacht. Peters said Mrs. Schacht signed it.) It read: Please take orders from no one but Mr. Horton.'' Mrs. Schacht at first testified that she thought the sign was put up before Christmas, but when asked on cross-examination if the time was not December 31, when the transaction had been ''entirely closed,'' she said: ''I can't tell you whether it was or not.''

''Q. Don't you believe it was then? A. No sir, I believed it was until I spoke to one of the mechanics and he is on Mr. Peters' side now for some reason or other, so I can't be positive.''

Peters' testimony, corroborated by witnesses for him, was positive that the sign was put up on the 31st after the transaction was closed.

Continuing, Mrs. Schacht testified that from December 2 to December 31 she was present ''off and on'' in the office; that she assisted Peters in learning about the business; that this continued ''until I just stepped out around the first of January or 31st of December,'' after which time she rendered Peters no assistance.

On further cross-examination by Mr. Hocker she testified that after the contract was made on December 2, Peters ''was around there trying to learn all he could about the business,'' as was Horton; that while Horton knew how to repair automobiles he had to learn ''things that he didn't know anything about;'' that neither Peters nor Horton knew anything about the stock and ''had to get familiar with that.'' All the money that came in from December 2 to December 31, no matter who used it, was accounted for in the settlement. ''Mr. Peters got the profits out of it pursuant to the terms of the contract and I got the interest on the money until it was paid to me.''

Being further interrogated by Mr. Miller she said that after making the contract she became apprehensive as to Peters' ability to fulfill his part thereof and demanded that Peters' father should guarantee that he would fulfill his contract, which the elder Peters did. She was satisfied after Peters' father signed that she would get the money; didn't expect to get it and didn't get it till December 31st, ''and that is not when I turned this business over. I turned it over to him the 2nd of December.'' The date when Peters' father guaranteed the contract on Peters' part is not shown except that it was after December 2.

Peters testified in substance that he did not take possession or undertake to assume any control over employees or give orders to employees ''or otherwise'' until the deal was closed on the 31st; may have rung up a few sales on the cash register; knew nothing about the business and his main reason ''for being around there'' was to acquire knowledge of the business; did not bank any of the money ''or take any of the money appropriated to myself in any way;'' employed a bookkeeper to keep track of money taken in and disbursed ''according to the contract of December 2nd;'' may have answered

the telephone sometimes, if so "answered whatever requests were made;" expected to be able to go through with the trade and proceeded upon the assumption that it would be closed before January 2nd, but was not sure as title had to be examined, etc., and there were some outstanding contracts by which Mrs. Schacht had agreed to sell some of the real estate from which she had to procure releases before she could convey to him, which releases were not procured until the 31st. (Mrs. Schacht was uncertain just when those releases were procured but thought it was on December 2.)

He further testified that he never paid out any money there of his own or otherwise "that wasn't taken into account in the settlement." If the stock ran short and had to be replaced Mrs. Schacht made purchases to replenish it. "Bills (for merchandise) created during the month of December, after December 2nd, or charge or open account that was sold and the money was credited in this statement here and was paid by the Busy Bee Motor Car Company after they acquired it . . . That stood as an indebtedness aginst me and which I later, through my company, took care of." If merchandise was paid for in cash by Mrs. Schacht she was credited in the settlement; "that was all adjusted on this date, the 31st." In that "respect" Mrs. Schacht got her money back. He said further that while she may have consulted him about purchases of supplies after December 2, she did the ordering; that he paid for such merchandise ultimately, it being all adjusted under the contract when the deal was closed. Mrs. Schacht "was not spending my money if the contract hadn't gone through."

He further testified that Horton came and brought with him his seven men who "worked on the paper trucks belonging to Mr. Horton," but did not "work on other things around there," and whose work on those trucks was supervised by Horton, but that Horton supervised nothing else to witness's knowledge. Horton's trucks had to be kept in repair and Horton kept mechanics there for that purpose who did nothing else and whom he paid; "before the trucks came up if the deal didn't go through we would make an adjustment for the storage." Witness employed Miss Hennsler to keep track of the money received and disbursed. Witness had taken an inventory on December 2 and as stock was being sold he had to keep the inventory up to date and he kept track of that. If men in the shop needed a tire or other part from the stock room they had to get most of such things from him, such use of parts being placed on the back of the repair order and thus kept track of. "If there was a call came in from outside trouble and I was there I answered the telephone and would give the necessary orders. Such an order was submitted to the shop foreman and Mr. Athey was one of those men that shot trouble. He was the trouble shooter." Receipts from the sale of gasoline, accessories, etc., "went into this account and of course I

received the money for that ultimately.'' After December 2 he paid Mrs. Schacht interest on the unpaid purchase price and received from the conduct of the motor repair business all profits, that is, gross sales minus the money spent; ''it was adjusted under the terms of the contract.'' Witness got credit for the money deposited in the Southwest Bank, but did not get or draw out that money itself. Mrs. Schacht alone having such authority. ''I got the benefit of it in the adjustment. All the money that was deposited over there, in other words, all the money that was taken in, in that business, eventually inured to my benefit.''

Peters testified further that he did not take care of the weekly payrolls prior to December 31, that it was done by Mrs. Schacht; that ''there were no other arrangements or contract in existence of any sort other than the one of December 2nd entered into while I was in there after December 2nd, only I think my father guaranteed . . . . that this particular contract would be carried out. Nothing was done about any other arrangement. Mrs. Schacht didn't seem satisfied that I was sufficiently able to carry out that contract, but everything was done pursuant to that contract. There was no other contract under which I did anything except this contract of December 2nd.''

I. We are of the opinion that the evidence is insufficient to show or to authorize a finding that the relation of master and servant existed between Peters and the truck driver at the time of the accident so as to make the former responsible for the latter's negligence, if any. Plaintiff, relying upon the existence of that relationship, must of course maintain it by evidence in order to make a case against Peters.

We start with the admitted fact that prior to the contract of December 2nd, the properties and business involved belonged to and were in possession of and operated by Mrs. Schacht and the Busy Bee Company. For convenience and brevity we may, for the purpose of this case, treat Mrs. Schacht as the owner and operator. Athey, the driver, was the employee and servant of such owner. The contract did not change, but on the contrary continued, that relationship between such owner and Athey. Plaintiff asserts that the contract is silent as to the control or right of control of the business pending its consummation by execution and delivery of conveyances and payment of the purchase money. In this plaintiff is clearly in error. By the contract the owner does not purport presently to sell and deliver, but only agrees to sell, transfer and deliver the properties and business or cause them to be sold, transferred and delivered at the time and upon the conditions therein provided, when conveyances are to be made. Rents, interest, water license, taxes and insurance are to be adjusted as of date of transfer of the property.

Bills receivable, held at the time of consummation, except as to profits, remain the property of the vendor. If the owner shall for any reason be unable to transfer good title to the properties agreed to be conveyed she limits her liability to the purchaser to the payment of the reasonable cost of examining titles and the refunding of the earnest money. Titles are to be examined and the Bulk Sales Law complied with before conveyances are made. The parties agree that *if the contract is finally consummated* the purchaser is to pay interest on the unpaid purchase money and in consideration thereof the *owner is to account to the purchaser* for profits *made by said owner* out of the operation of the business from date of contract to "date of transfer of deeds," and the owner is to install books for the purpose of ascertaining such profits. Unquestionably the contract contemplates and in effect provides for retention by the owner of the control and operation of the business as well as title to and possession of the properties until consummation of the contract by delivery of conveyances to the purchaser upon payment by him of the purchase money as stipulated.

II. Plaintiff contends further that even if the contract left the right of control in the owner pending its consummation, Peters could and did assume such control as to place himself in the relation of master to Athey, notwithstanding he may have had no *right* under the contract to do so. Plaintiff's case as to Peters must rest upon that contention. If it be conceded for the purpose of the case that, so far as the law is concerned, Peters could so have assumed the relation of master to Athey and have become responsible under the doctrine of *respondeat superior* for the latter's alleged negligence, we think the evidence insufficient to authorize a finding that he did so.

It is strongly urged that Mrs. Schacht's testimony that Peters paid the wages of the employees, including Athey, for the week ending December 31, during which week the accident occurred, is a circumstance from which may be drawn the inference that he had assumed control and stood in the relation of master. Grant that ordinarily the fact that one person pays another for services tends to prove that the person receiving the payment is the servant of the one making it, Mrs. Schacht's testimony shows that she herself in legal effect paid those wages. By the contract, if consummated, Peters was to have the profits of the business for December. "Profits" meant the receipts less expenditures chargeable against or to be deducted from such receipts. Mrs. Schacht testified, as did Peters, that when the transaction was consummated on December 31 they settled according to the contract. By the provisions of that instrument she owed those wages or in any event they were payable and to be deducted from the receipts A written statement made as of that date showing the sum

due from Peters and the credits given to and payments made by him in satisfaction thereof was introduced by plaintiff. The item thereof showing the profits to which Peters was entitled appeared as a credit to him on the balance of purchase price due, thus: ''Cash receipts, December 2nd to date, $3,469.89.'' Speaking of that statement Mrs. Schacht said it was ''a statement of the settlement pursuant to the contract;'' that it showed ''what the amounts were and how they stood,'' and that she ''turned over to him the profit of the business.'' Her testimony elsewhere shows that what she meant by ''turning over'' the profits was giving him credit therefor in the settlement as payment for that much money on the amount he owed her. Repeatedly she said she turned over ''the profits.'' In one place she said, speaking of the profits of the business; ''The statement (above referred to) will show that we turned it over to Mr. Peters—three thousand and some dollars. That was the net receipts.'' Net receipts could only mean the total receipts less deductions chargeable against them. Wages of employees engaged in operating the business would have to be so charged in order to determine the profits or net receipts. It can not matter whether Mrs. Schacht paid the men personally and credited Peters with the balance of the receipts or left it to Peters, who was then taking over the business, to pay them and included in the credits given him in the settlement the amount so to be paid. It is clear from her testimony as to settling according to the contract and turning over the profits and her reference to net receipts that the latter was the method adopted. The result is the same, viz., that either way, in legal effect, she made the payments. In like manner, as shown by said statement, Peters gave his check to the realty company to which Mrs. Schacht owed a commission of $5,875 upon the closing of the sale and was credited in the settlement with that sum as paid on the purchase price to Mrs. Schacht. It would hardly be contended that Mrs. Schacht did not in effect pay that commission.

For the same reasons plaintiff's argument, based upon an alleged ''implied admission'' of defendant that he paid out some of his own money to employees must fail. Plaintiff's evidence showed no other payments by Peters to Athey or other employees engaged in operating that business. But plaintiff stresses Peters' testimony: ''I never paid out any of my own money to the employees that wasn't taken into account in the settlement,'' claiming that he thereby impliedly admitted that he did pay some money of his own to employees.

The money of his own thus referred to was that used in payment of the wages above discussed for the week ending December 31, which he said was paid after the contract had been consummated on the 31st by the new company formed by him and to which he at once transferred the business, he signing the checks. But in the same

connection he testified the amount so paid, or to be paid, was taken into the account and adjusted in the settlement with Mrs. Schacht,— in substance and effect as she had testified on that subject.

III. Plaintiff insists that "whatever work was done in the operation of the business" during December was for the benefit of Peters "and no one else," which it is claimed tends to establish or to show the existence of the relation of master and servant between Peters and the employees doing the work; citing 1 Labatt's Master & Servant (2 Ed.), p. 69, sec. 22. If the work or service in which Athey was engaged was being done, as plaintiff argues, solely for Peters' benefit, the inference claimed by plaintiff might be permissible. But such is not the case. Peters was to have the profits only *if* and *when* the contract should be consummated by payment of the purchase price and conveyance of the properties and business. At the time of the accident the contract was still executory and the properties and business still belonged to the original owners. While the operation of the business during December ultimately inured to Peters' benefit he got that benefit only upon and by virtue of the *consummation* of the contract. At the time of the accident those "benefits" still belonged to the original owners and had the contract not been consummated would have continued so to belong. If the contract had failed of consummation because of Mrs. Schacht's inability to make good title she would have kept the profits and according to the contract Peters would have got nothing except the return of the earnest money he had paid and reimbursement for his reasonable outlay for examining titles. If Peters had failed to perform whatever might have been his liability to Mrs. Schacht he certainly would not have received those profits. In these circumstances we think it can not be said that the business was operated for Peters' benefit so as to make applicable the rule invoked by plaintiff.

As to other work being done about the premises, that done by the men brought in by Horton is not shown to have had relation to the conduct of the business in question, it being Horton's own business in which Athey was not employed; and so far as the principle now under discussion is concerned the work of remodeling and changing the interior of the building, which Peters had done, can hardly be said to have affected the situation as to Athey whose services were not in connection with that work.

IV. It is, however, further contended that the facts that Peters proceeded at his own cost to make those improvements, that he "put a man in charge of the stock room," employed a bookkeeper, "had access to the cash register and took money out of it for his own use," etc., tend to show that the parties interpreted the contract as giving

him the right of control and that he took and exercised control. We think not. Such acts as the employment of the bookkeeper, putting a man in the stock room and exercising certain supervision there were in line with the rights of the parties under the contract and within its contemplation. Peters had the right under the contract to keep informed as to the profits and the status of the stock. Whatever money he used, if any, from the cash register was taken into account in the settlement according to the testimony of both parties, and of course was intended to be so accounted for. The work of improvement, from the description thereof, could not have been very extensive or costly and was evidently done with Mrs. Schacht's consent as she nowhere intimates that she objected; and while not within the provisions of the contract its nature and extent were such as might naturally have been permitted by the owner and done by the purchaser under the circumstances in anticipation of the consummation of the contract and without intention on the part of either of changing or affecting their respective rights and relationships under the contract. Mrs. Schacht testified that from December 2 to December 31 she acted under the contract and we think her whole testimony clearly indicates the correctness of that conclusion. She gave no testimony indicating that there was ever any other understanding or arrangement between her and Peters.

As we have seen, the contract left the possession and control of the business in the owner with such owner occupying the relation of master to Athey. In order to authorize a finding that the parties by their subsequent conduct substituted the purchaser for the owner as master, especially where, as here, both parties claimed to have acted and evidently intended to act under and in accordance with the contract, certainly the actions relied upon to show such substitution must have been inconsistent with the contract. If what Peters did was as readily and naturally referable to and consistent with the contract and his rights thereunder as to and with the theory that he had assumed and was exercising control of the business contrary to the contract, as it appears to us it was, we think plaintiff's case must fail, upon somewhat the same principle as a plaintiff's case fails where the injury complained of is shown to have been due to one of several causes, for one of which but not for the others the defendant would be responsible but where the evidence fails to show that the injury was due to the cause for which the defendant would be responsible.

V. It is argued that Peters gave orders concerning the conduct of the business and sometimes answered telephone calls. Mrs. Schacht's testimony on direct examination as to the giving of orders was vague, not showing what the orders were or to whom given, except that she

said he told her how to keep the records (which the contract provided should be done as he wished), and to "send men out on trips when the calls came in." On cross-examination she said she did not know whether or not he gave orders to the men in the shop. Peters testified that he sometimes answered telephone calls and "would give the necessary orders," but he also said in that connection that such orders "were submitted to the shop foreman." On this subject certain other testimony of Mrs. Schacht must be kept in mind. When first asked who gave orders after December 2nd, she said: "They weren't always given by the same party. *We* didn't decide who was going to be foreman, although most of the orders were given by Mr. Peters until Mr. Horton came in." (Italics ours.) On cross-examination she said that one Stanton, who was "on the payroll" and with whom "nobody could get along," was considered foreman and gave orders until the sign heretofore mentioned was put up, *after which time* the men took orders from Horton as the sign directed. She did not specifically say when or by whom Stanton was employed but she did not include him as one of the new men who, she said, were there after December 2nd. There was no evidence tending to show that Peters employed him. Mrs. Schacht could not say when the sign was put up. Peters' evidence was positive that it was done on December 31st immediately upon the consummation of the sale and transfer of the business and Mrs. Schacht admitted that she had believed it was at that time until after she had talked with one of the mechanics. The circumstances testified to by Mrs. Schacht tend to corroborate Peters on that point. The only reasonable inference or conclusion to be drawn from Mrs. Schacht's testimony on this subject is that Stanton was an employee of the "owner" at and prior to the making of the contract on December 2nd and was deposed as foreman and Horton placed in his stead by Peters as soon as the latter acquired authority to do so on December 31st. The fact that such notice was put up directing employees to take orders from Horton, Peters' employee, and that so far as the evidence shows, no direction, written or verbal, had previously been given them to look to Peters or his representative for orders, strongly indicates that until the posting of that notice there was no attempt or intention on the part of either party to the contract to change the authority over the employees.

In 1 Labatt's Master & Servant (2 Ed.), page 77, section 25, it is said:

"It is well settled that, where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted purpose, without incurring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled."

We find nothing in the evidence indicating that Peters, in whatever orders or directions he may have given, went beyond what might naturally have been expected of one in his position in the circumstances, consistent with the rights and relationships of the parties under the contract and without altering or attempting to alter those relationships. Moreover, whatever he did was clearly with permission of Mrs. Schacht. Since under the contract, pursuant to which she said she was acting, she remained the owner and in control of the business, we are inclined to think that as to such acts done and directions given by Peters he is to be regarded as her agent, making such acts and directions hers.

VI. Mrs. Schacht testified that she was interested in the Busy Bee Company, after December 2nd, only as an employee; also that after said date she did not operate the business. Both statements were conclusions and the court sustained defendant's objections, but after the questions had been answered, and there was no motion to strike out, wherefore plaintiff argues that the testimony is to be treated as evidence in the case. Conceding for the purpose of the case, but without deciding, that such testimony, not having been stricken out, is to be considered, it has no probative value. A statement which is a mere conclusion, contradicted by the facts shown, "must yield to the real facts." [Tevault v. Citizens' State Bank (Mo. App.), 183 S. W. 358, 359.] The contract negatives Mrs. Schacht's conclusion that she was only an employee after December 2nd, and her testimony shows that she made no agreement or arrangement with Peters other than the contract. Relative to the statement that she did not operate the business after December 2nd, when the court sustained the objection and indicated that he would permit plaintiff to show what was said and done, by which that question would have to be determined, plaintiff undertook to make the proof accordingly. Under the circumstances the court's ruling might well be treated as in effect a striking out of the answer, and seems to have been so treated by counsel. In any event, since the witness gave the facts upon which her conclusion was based, the question is to be determined from those facts and not from the statement of her conclusion. We have seen that the facts shown do not justify the conclusion. She further testified that she turned the business over to Peters on December 2nd. She could only have meant that she turned it over by the contract as she testified to no other act or agreement of that date which could possibly be so construed. Nor did she claim that she had surrendered the business or the control and management thereof to Peters after December 2nd and before December 31st. Again her conclusion must yield to the facts. She did not turn over the business or its control on December 2nd by the contract, as we have pointed out.

In view of the conclusion we have reached on this branch of the case as to Peters, the case having been dismissed as to other defendants, it becomes unnecessary to consider other points urged in support of the trial court's order. For the reasons set forth we are of the opinion that the order of the circuit court sustaining defendant Peters' motion for new trial was proper and it is therefore affirmed and the cause is remanded. *Westhues* and *Fitzsimmons, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.